# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**RHONDA H.,**

      **Plaintiff,**

  v.                                       **Civil Action 2:21-cv-5888**
                                                  **Judge James L. Graham**
                                                  **Magistrate Judge Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Rhonda H., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.     BACKGROUND**

Plaintiff protectively filed her applications for DIB and SSI on December 28, 2018, alleging that she was disabled beginning December 19, 2018, due to severe COPD, emphysema, and depression. (Tr. 189–201, 213). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on October 20, 2020, before issuing a decision denying Plaintiff's applications on October 30, 2020. (Tr. 35–56, 12–34). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final for purposes of judicial review. (Tr. 1–6).

Plaintiff filed this action on December 22, 2021 (Doc. 1), and the Commissioner filed the administrative record on February 15, 2022 (Doc. 7). The matter has been briefed and is ripe for consideration. (Docs. 8, 12).

### A.  Relevant Statements

The ALJ summarized Plaintiff's statements to the agency and hearing testimony as follows:

*** [Plaintiff] testified that she was unable to work because of COPD. She slept with a wedge under her mattress, as she coughed all night. She was able to climb stairs but would have to rest. She estimated that she could lift about twenty-to-twenty-five pounds and could stand for about forty-five minutes. The weather affected her breathing. Additionally, she reported sore knees but stated that injections helped to relieve pain for several months. She reported no side effects from medications (Exhibits 1E, 4E, 6E, 8E, and testimony).

With regard to activities of daily living, [Plaintiff] testified that she lived with her aunt. She reported that she was able to attend to personal hygiene. At hearing, she testified that it took her about an hour to get moving in the morning. She spent time watching television, sitting on the porch in nice weather, sweeping the floor, doing the dishes, and helping with laundry. She did not go out very much. She reported having a couple of friends and that she enjoyed fishing (Exhibit 6F/3 and testimony).

(Tr. 21).

### B.  Relevant Medical History

The ALJ summarized Plaintiff's medical records as to her physical impairments as follows:

*** Prior to the alleged disability onset date, she underwent pulmonary function testing on November 26, 2018. That testing demonstrated severe obstructive lung disease. Spirometry findings did not significantly improve after the administration of an inhaled bronchodilating medication (Exhibits 1F/6-7 and 2F/92).

[Plaintiff] presented to the emergency department on November 27, 2018, reporting a one-week history of shortness of breath. She was noted to be improved significantly with nebulized breathing treatment. She was able to walk without difficulty. She was continued on Zithromax, steroids, and nebulizer breathing treatments. She was discharged with diagnoses of acute bronchitis, shortness of breath, and tobacco use (Exhibit 2F/95-96).

[Plaintiff] followed-up with her primary care provider on November 29, 2018. She reported that her recent symptoms of shortness of breath had occurred suddenly. She awoke one week prior gasping for breath. She was on a trip to New York and

had done a lot of walking on the trip. She reported ongoing cough and shortness of breath but no wheezing. Pulmonary examination showed normal effort and breath sounds. She was assessed with COPD with acute exacerbation and was noted to be a smoker (Exhibit 1F/17-18).

A CTA of the chest performed December 5, 2018, showed scattered emphysematous airspaces identified at the upper lobes. There was no evidence of pulmonary embolism or acute pulmonary abnormality (Exhibits 1F/4 and 2F/124).

[Plaintiff] returned to the emergency department on December 5, 2018, reporting shortness of breath that had been present for several weeks. She was also having chest pain rated an eight in severity on a ten-point scale. Chest pain was worse with cough or taking a deep breath. A breathing treatment did not provide significant relief. Pulmonary examination showed respiratory distress and wheezing. She was assessed with a COPD exacerbation. She was treated with IV steroids, bronchodilators, and Mucinex. She remained in the hospital until December 8, 2018, at which time she was discharged with Medrol Dosepak and antibiotics (Exhibits 1F/20 and 2F/112, 126, 133).

[Plaintiff] presented for an evaluation in the lung clinic on December 20, 2018. She reported that she had shortness of breath in the morning and daily cough. She occasionally had sputum production, and it was hard to mobilize when she did. She smoked one pack of cigarettes per day from age eighteen to age fifty-one. She was down to smoking one-to-two cigarettes per day. She was also exposed to dust, fumes, and chemicals in her job for twenty years. She had one hospitalization that year for breathing difficulties. She was taking Atrovent HFA, twice a day. Respiratory examination showed minimal wheeze and no distress. She had no conversational dyspnea and no use of accessory muscles. She was started on new medications and was advised to quit smoking (Exhibit 11F/1-8).

On December 26, 2018, [Plaintiff] presented to the emergency department with an episode of acute bronchitis without hypoxia. Examination showed labored breathing and conversational dyspnea. She was speaking clearly. She was discharged home with Levaquin and prednisone (Exhibit 2F/147-148, 151).

[Plaintiff] returned to the lung clinic on April 11, 2019. Since her last visit, she was noted to have outpatient exacerbations in February and March 2019. She reported shortness of breath with steps and daily cough, worse at night. She had daily sputum production that was hard to mobilize. Her flutter valve helped. She was smoking a half pack of cigarettes per day. She was taking Stiolto and Arnuity daily. She also used Xopenex HFA approximately once every two weeks and her nebulizer every two-to-three days. The chest was clear to auscultation bilaterally except in the right lower lung. She had a wheeze that cleared with coughing. She was in no distress, had no use of accessory muscles, and no conversational dyspnea. She was continued on medications and was encouraged to quit smoking (Exhibit 11F/9-16).

3

Pulmonary function studies performed April 11, 2019, showed a moderately severe obstructive impairment with no significant bronchodilator response (Exhibit 4F/11).

X-rays of the chest performed May 23, 2019, were without acute process (Exhibit 8F/11).

[Plaintiff] returned to her primary care provider on June 6, 2019, reporting a COPD exacerbation. She reported cough and wheezing. She was not using albuterol, stating that she would rather use breathing treatments. She usually used breathing treatments twice a day, sometimes more often. She was noted to be winded with walking from the lobby to the examination room. Pulmonary examination showed scattered wheezes throughout with normal effort. She was prescribed prednisone for an acute COPD exacerbation (Exhibits 7F/2-4 and 18F/5-7).

[Plaintiff] returned to the lung clinic on August 12, 2019. At that time, her COPD was noted to be of moderate severity. She had no inpatient hospitalizations since her last visit and at least four outpatient exacerbations. She had recently finished steroids and was feeling good. She had shortness of breath with activity and coughed every morning. She also had daily sputum production and reported that it was easy to mobilize. She continued to smoke a half pack of cigarettes per day. Respiratory examination was unremarkable. It was noted that her April 2019 pulmonary function testing demonstrated moderate COPD. Prior testing completed in November 2019, which had shown severe COPD, had been completed while she was ill. She was provided medication adjustments (Exhibit 11F/18-24).

[Plaintiff] reported improvement during a visit to the lung clinic on November 12, 2019. She had not required inpatient hospitalization for COPD since her last visit. She had shortness of breath with activity and daily cough, although this was better than it had been in the past. She smoked between a half pack of cigarettes per week to a half pack per day, depending on how she was feeling. Respiratory examination was unremarkable. She was continued on medications (Exhibit 11F/26-33).

On February 13, 2020, [Plaintiff] reported during her visit to the lung clinic that she had not needed inpatient or outpatient treatment for COPD since her last visit. She had shortness of breath with activity, including walking distances or going up steps. She had a daily, productive cough. She smoked a half pack of cigarettes per day. Respiratory examination was unremarkable. She was again continued on medications (Exhibit 11F/34-41).

X-rays of the chest performed June 25, 2020, showed no acute cardiopulmonary process (Exhibit 13F/51).

Repeat pulmonary function testing performed August 10, 2020, showed moderately severe obstruction (Exhibit 14F/166).

4

[Plaintiff]'s examination at the lung clinic were stable on August 14, 2020 (Exhibit 15F/1-6).

In addition to her COPD, [Plaintiff] presented to the emergency department on October 7, 2019, reporting left knee pain. She had been working on an estate sale for several days with a lot of standing or movement, which had worsened her pain. Examination showed normal range of motion and no effusion, ecchymosis, deformity, laceration, and erythema. Alignment was normal. She had tenderness along the superior boarder of the patella. X-rays showed a moderate left knee joint effusion. She was provided an injection of Toradol, with improvement of her pain. She was also provided a prescription for Toradol (Exhibit 14F/26-29).

On November 1, 2019, [Plaintiff] presented for an orthopedic evaluation reporting intermittent pain, aching, and swelling in the left knee. She had no history of injury. Her pain was interfering with sleep. Her pain was worse with weight-bearing and activity. She also awoke with pain. Examination showed a mild effusion. There was no medial or lateral joint line tenderness. She had no tenderness with patellar compression. The patella was well-centered and tracking properly. The knee was stable to valgus and varus stress. Lachman sign was negative. She had no pain with hip motion. X-rays showed the joint spaces to be well-maintained with no significant osteophyte formation or narrowing. An MRI showed signs of synovitis and a suprapetallar effusion but no convincing signs of meniscal tear or ligamentous injury. She was assessed with synovitis of the left knee. She was prescribed Diclofenac (Exhibits 12F/9-10, 13F/39-40, 14F/40, and 18F/17-19).

[Plaintiff] returned to her orthopedist on November 15, 2019. She reported considerable pain and swelling in the left knee. Her pain was worse with weight-bearing activity and also hurt at rest. On examination, she had a large effusion of the left knee. It was not warm. She was assessed with synovitis of the left knee of unknown etiology. She had liquid aspirated from her left knee (Exhibit 12F/7-8).

On November 26, 2019, [Plaintiff] reported that she continued to have pain and swelling in the left knee, along with weakness. She stated that she was having difficulty doing her daily activities because of pain. Examination showed a mild effusion, less than had been present on the prior exam. There was minimal tenderness along the joint lines. There was no pain with motion of the knee and no warmth. She underwent aspiration and was administered a steroid injection (Exhibit 12F/5-6).

X-rays of the left knee performed June 18, 2020, showed normal appearing joint surfaces and soft tissue swelling consistent with effusion (Exhibit 12F/1).

On June 19, 2020, [Plaintiff] reported that she had increased swelling when on her leg for more than two hours a day. She rated her pain a nine in severity on a ten-point scale, although this depended on how much she was on her leg. She again

5

underwent aspiration and injection of the left knee (Exhibits 12F/2-4 and 18F/30-32).

[Plaintiff] underwent a rheumatology evaluation on September 10, 2020, because of her continued left knee pain. She stated that cortisone injections had lasted four-to-five months before fluid would begin to build up again. Her last injection was in May, and she denied any current pain, swelling, or stiffness. The left knee showed minimal effusion without synovitis. Strength was full in the bilateral upper and lower extremities. She was able to get out of her chair without support. She was assessed with chronic/recurrent left knee arthritis. She was referred for an MRI and autoimmune serologies (Exhibit 17F/1-3).

(Tr. 21–25).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through December 31, 2023. (Tr. 18). She has not engaged in substantial gainful employment since December 19, 2018, the alleged onset date. (*Id.*). The ALJ also determined that Plaintiff has the following severe impairments: chronic obstructive pulmonary disease ("COPD") and left knee synovitis/arthritis. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 20).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following limitations: occasionally climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; frequent stooping, kneeling, and crouching; occasional crawling; occasional exposure to concentrated irritants, such as dust, odors, fumes, and other pulmonary irritants; occasional exposure to humidity and extreme heat and cold; limited to no more than four hours of standing or walking during the day; and able to sit or stand, as needed, without being off task.

(Tr. 20).

As for the allegations about the intensity, persistence, and limiting effects of Plaintiff's symptoms, the ALJ found that Plaintiff's "symptoms are not entirely consistent with the medical

6

evidence and other evidence in the record . . . ." (Tr. 21).

The ALJ relied on testimony from a Vocational Expert ("VE") to determine that Plaintiff was unable to perform her past relevant work as a bartender or stores laborer. (Tr. 28). Further, relying on the VE's testimony, the ALJ determined that given Plaintiff's age, education, work experience and RFC, she was able to perform work that existed in significant numbers in the national economy. (Tr. 28–29). Consequently, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since December 19, 2018. (Tr. 29–30).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her Statement of Errors, Plaintiff contends: (1) that the ALJ's residual functional capacity finding is inconsistent with "light" work, and that the Medical-Vocational Guidelines (GRID) rules would direct a disability finding; (2) that the ALJ erred at step five of the disability

evaluation sequential process; and (3) that the ALJ erred in evaluating the opinion of her certified nurse practitioner, Bryson Stair. (Doc. 8).

The Commissioner counters that the ALJ properly concluded that Plaintiff was limited to a restricted range of light work, determined Plaintiff could perform other work in the national economy, and evaluated the opinion evidence consistent with the regulations. (Doc. 12).

**A. The ALJ's RFC Finding**

Plaintiff says the RFC—which limits her to no more than four hours of standing or walking during the day, with the ability to sit or stand as needed—while nominally labeled as a reduced range of light work, instead indicates she "would be performing work at no more than the sedentary exertional level." (Doc. 8 at 16–18). This is not harmless error, she says, because if she was limited to sedentary work, the Medical-Vocational Guidelines would direct a disability finding. Indeed, if an individual is limited to sedentary work, is closely approaching advanced age, has a limited education, and her previous work is unskilled or has no transferable skills to sedentary positions, a disability finding follows. 20 CFR Part 404, Subpart P, Appendix 2, Table No. 1, §§ 201.09–10. The ALJ did establish that Plaintiff was closely approaching advanced age and had a limited education, though the transferability of previous job skills was not considered, as it was not material, given Plaintiff's RFC to perform a reduced range of light work. (Tr. 28).

If Plaintiff's RFC was, as she argues, sedentary work disguised as a reduced range of light work, remand would be appropriate for the ALJ to consider whether the Medical-Vocational Guidelines direct a disability finding. The Commissioner counters, however, that the RFC properly falls into a reduced range of light work, with capabilities beyond sedentary work. (Doc. 12 at 5–7). The Undersigned agrees with the Commissioner and finds this assignment of error without merit.

8

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. § 416.945(a). Generally, light work is characterized by "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds[,]" and "a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. Generally, sedentary work requires "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools[,]" and "walking and standing . . . occasionally" when "other sedentary criteria are met." 20 C.F.R. § 416.967(a). Occasional walking and standing means that at the sedentary exertional level, "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday." SSR 83-10.

The ALJ found that Plaintiff was capable of work "limited to no more than four hours of standing or walking during the day[,]" and that she would be "able to sit and stand, as needed, without being off task." (Tr. 20). Plaintiff says it is likely she would "be seated for a considerable amount of time during the workday," and the RFC is therefore a sedentary profile. (Doc. 8 at 16–17). But that logic does not follow. Notably, sedentary work should generally require no more than two hours of standing/walking in an eight-hour workday. SSR 83-10. But the ALJ found Plaintiff capable for standing/walking for up to four hours per workday. Her RFC is therefore not as limited as sedentary work. Even though four hours falls short of six hours required to do the *full* range of light work, this only means Plaintiff is capable of a *reduced* range of light work.

9

Moreover, several criteria can distinguish light work from sedentary work. One criterion is the amount a person can lift at work. The ALJ determined that Plaintiff could lift twenty-five pounds, based on her own testimony. (Tr. 25). This means Plaintiff can engage in light work, in which she is required to lift no more than twenty pounds—while the sedentary work requirement that she lift no more than ten pounds would fall significantly below her capability. 20 C.F.R. § 416.967(a)–(b). This is notable because the regulations state that work can be sedentary when it involves occasional walking/standing and "other sedentary criteria are met." 20. C.F.R. § 416.967(a). Lifting is the other noted sedentary criterion. *Id.* Additionally, light work can involve sitting most the of the time if it involves the pushing and pulling of arm or leg controls, and the ALJ found no manipulative limitations for Plaintiff that preclude that type of movement. All told, Plaintiff's RFC is properly a reduced range of light work, not disguised sedentary work, and her allegation of error is therefore without merit.

### B. The ALJ's Step Five Finding

Plaintiff next says the ALJ erred at step five. Particularly, the ALJ found that Plaintiff could perform the jobs of ticket seller, routing clerk, and mail clerk. (Tr. 29). But Plaintiff says this mischaracterizes the testimony of the VE, who stated that those hypothetical positions would be reduced to only ticket seller if the ALJ incorporated the ability to alternate between sitting and standing into the RFC, which he ultimately did. (Doc. 8 at 18–19). This is harmful error, Plaintiff says, because it undermines the ALJ's finding that jobs exist in significant numbers which Plaintiff could perform. (*Id.*). The Commissioner counters that the error is not harmful, because the 150,000 ticket seller jobs in the national economy establish that jobs exist in significant numbers which Plaintiff could perform, and the ALJ therefore carried his burden at step five. (Doc. 12 at

8–11). While the ALJ's error is clear, the Undersigned agrees with the Commissioner that it does not constitute reversible error.

>When questioning the VE, the ALJ first presented a hypothetical individual:
>
>. . . limited to work at the light exertional range, with the following additional limitations. Occasionally, climb ramps and stairs, no climbing ladders, ropes, or scaffolds. Up to frequently stoop, kneel, crouch, occasionally crawl. Occasional exposure to concentrated irritants such as dust, odors, fumes, and other pulmonary irritants. Occasional exposure to humidity and extreme heat and cold.

(Tr. 51–52). The VE testified that the following example jobs could be performed with the hypothetical limitations: ticket seller, at 150,000 national jobs; merchandise marker, at 150,000 national jobs; and mail clerk, at 140,000 national jobs. (Tr. 52). The ALJ then presented a second hypothetical individual with the same limitations, with the addition "that the individual would be limited to no more than four hours of standing or walking during the duty day." (*Id.*). The VE testified that the ticket seller jobs could be performed at the same numbers but reduced the mail clerk jobs to 60,000 and substituted a routing clerk position with 60,000 jobs. (*Id.*).

Finally, the ALJ added an additional limitation that the hypothetical individual be allowed to alternate between sitting and standing as needed, without being off-task, culminating the hypothetical into what would ultimately be adopted as Plaintiff's RFC. (Tr. 52–53). The VE testified that with that additional limitation, only the ticker seller jobs could be performed. (Tr. 53). Yet, when the ALJ reported the jobs Plaintiff could perform in his opinion, he mistakenly included the jobs identified by the VE in response to the second hypothetical. (Tr. 29). While both parties acknowledge this mistake, they dispute whether the error was harmful. Namely, they dispute whether the reduction of 270,000 jobs in the national economy across the three positions to 150,000 jobs in the national economy in only the ticket seller position materially affects the ALJ's finding that significant jobs exist which could be performed by Plaintiff.

11

As the Commissioner identifies, the Sixth Circuit Court of Appeals has routinely held that jobs existing in numbers well below the 150,000 jobs available to Plaintiff constitute significant numbers to carry the step five burden. (Doc. 12 at 10) (collecting cases); *see, e.g., Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 904 (6th Cir. 2016) (finding that 6,000 national jobs "fits comfortably" into what the Circuit and others have deemed significant); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009) (2,000 jobs were significant). Because the 150,000 jobs available to Plaintiff so far outstrip these figures, the Undersigned finds no reason to disturb the ALJ's finding simply because he misstated the VE's testimony. In other words, if the ALJ had properly recounted the VE's testimony in his written opinion, his determination that Plaintiff had the capacity to perform jobs that exist in significant numbers in the national economy would still be supported by substantial evidence. While the ALJ made a mistake in rendering his written opinion, Plaintiff has not demonstrated that remand in search of a perfect opinion would have any effect on the ALJ's ultimate disability determination. *NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (1969), *quoted in Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game"). The Undersigned finds Plaintiff's allegation of error without merit.

### C. Weight to Medical Source Opinion

Finally, Plaintiff says the ALJ failed to evaluate properly the opinion by certified nurse practitioner ("CNP") Bryson Stair. (Doc. 8 at 20–21). Particularly, she says that though CNP Stair opined that her episodes of COPD left her incapacitated for days at a time, the ALJ did not state why he declined to incorporate an allowance for absenteeism into the RFC. (*Id.*). The Commissioner counters that CNP Stair's opinion that Plaintiff would have "good days" and "bad

days" due to her COPD was vague and did not actually present a defined functional limitation—and the ALJ's discussion of the opinion was appropriate. (Doc. 12 at 11–15). The Undersigned finds no error in the ALJ's analysis of the opinion.

The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1]  20 C.F.R. § 404.1513(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 404.1520c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 404.1520c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 404.1513(a)(2), (5).

13

medical opinion. 20 C.F.R. § 404.1520c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 404.1520c(b)(2).

At bottom, the role of the ALJ is to articulate how he considered medical opinions and how persuasive he found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The role of the Court is not to reweigh the evidence, but to make sure the ALJ considered the proper factors and supported his conclusion with substantial evidence. *Id.*, at *14.

In discussing the questionnaire prepared by CNP Stair, the ALJ determined:

A Pulmonary Residual Functional Capacity Questionnaire was completed on August 18, 2020. The signature on this form is illegible. However, this provider opined that [Plaintiff] should avoid concentrated exposure to extreme cold, extreme heat, high humidity and perfumes. She was to avoid all exposure to fumes, odors, dusts, gases, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals. Her impairments were likely to produce "good days" and "bad days." This provider was not able to state how often she would be absent from work, as this depended on her exacerbations. The undersigned finds the assessed limitations for exposure to odors, cold, heat, and humidity to be persuasive, as they are consistent with her subjective reports at hearing and with evidence of COPD. Nonetheless, limitation to avoiding all exposure to fumes, odors, dusts, gases, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals is not consistent with evidence that [Plaintiff] continued smoking despite her COPD.

Moreover, her more recent treatment records show improvement in symptoms since initiating treatment. Thus, she does not need to eliminate all exposure to these pulmonary irritants (Exhibit 16F).

(Tr. 26–27).

First, CNP Stairs's statements about Plaintiff's limitations regarding absenteeism were vague and unsupported. The ALJ noted that CNP Stair "was not able to state how often [Plaintiff]

14

would be absent from work[.]" (Tr. 26). Indeed, CNP Stair declined to estimate how often, on average, Plaintiff would be absent from work, and instead merely wrote "depends on exacerbations." (Tr. 806). Additionally, he merely checked "yes" regarding the question of whether Plaintiff was likely to experience "good days" and "bad days" because of her symptoms. Because these opinions were vague and not accompanied by citations to objective medical evidence, it is apparent that the ALJ rated the supportability factor of the opinion low.

Moreover, the need for absenteeism was premised on exacerbations of Plaintiff's COPD, which CNP Stair generally opined as more serious than did the ALJ. Particularly, the ALJ noted that "limitation to avoiding all exposure to fumes, odors, dusts, gases, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals is not consistent with evidence that [Plaintiff] continued smoking despite her COPD[,]" and more recent treatment records which showed improvement of symptoms. (Tr. 26–27). Indeed, the ALJ thoroughly reviewed Plaintiff's medical records related to COPD, which consistently demonstrated that Plaintiff continued to smoke cigarettes despite advice to quit from medical providers, and that her COPD was treated with medications. (Tr. 21–24). Moreover, the ALJ adopted the state agency physicians' opined limitations that Plaintiff need only "avoid concentrated exposure" to pulmonary irritants. (Tr. 26 (citing Tr. 72, 105)). All told, CNP Stair's opinion that Plaintiff need avoid all exposure to pulmonary irritants, and that exacerbations of her COPD might cause absences from work, were not consistent with the ALJ's review of other medical records and opinions.

Said differently, the ALJ evaluated CNP Stair's opinion just as the regulations dictate—by considering its supportability and consistency. But he did not find that Plaintiff's COPD necessitated an absenteeism limitation in the RFC. This decision was supported by substantial evidence, and the Undersigned finds Plaintiff's final assignment of error without merit.

15

IV. **CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's decision.

V. **PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: November 30, 2022  /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE